United States District Court
Southern District of Texas
**ENTERED**
November 12, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DANIEL RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-20-1698 |
| | § | |
| TALOS GULF COAST OFFSHORE LLC, | § | |
| TALOS ENERGY LLC, AND | § | |
| TALOS ENERGY OFFSHORE LLC, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Daniel Ramirez, a subcontractor on an oil and gas platform in the Gulf of Mexico, had a medical emergency in the middle of the night on May 19, 2019. Ramirez was flown by helicopter from the platform to the West Jefferson Medical Center in Louisiana, where he was diagnosed with and treated for an ischemic stroke. The hospital did not administer Ramirez tissue plasminogen activator (known as tPA), a treatment that can dissolve blood clots in patients suffering an ischemic stroke. The stroke left Ramirez with permanent neurological problems.

The problem with tPA is that it is potentially lethal if administered to ischemic stroke patients more than four and a half hours after the stroke patient's "last known normal" or "last known well" time. For some patients, if more than three hours have passed, tPA can be lethal. The "last known well time" is the last time the patient was known to be without signs or symptoms of a stroke. If tPA is administered outside this narrow time frame, it can cause bleeding in the brain and death.

Ramirez alleges that if he had been administered tPA on May 19, 2019, he would have avoided any permanent neurological problems from the stroke. Ramirez alleges that he was not

administered tPA because he arrived at the West Jefferson Medical Center over four and a half hours after his "last known normal time," and was therefore ineligible to receive the treatment. Ramirez alleges that his "last known normal time" was approximately 12:45 a.m. on May 19, 2019, when he woke up on the platform 25 miles offshore feeling unwell.  Ramirez did not arrive at the hospital until 5:38 a.m. on May 19, 2019.  Ramirez alleges that defendants Talos Gulf Coast Offshore LLC, Talos Energy LLC, and Talos Energy Offshore LLC (collectively "Talos"), were negligent in failing to evacuate Ramirez faster.  Ramirez alleges that if Talos had timely evacuated him from the platform, he would have arrived at the hospital within the window for the tPA treatment.

Talos has moved for summary judgment on the basis that its conduct did not cause Ramirez to be unable to receive the tPA treatment, and that Ramirez cannot prove damages as a result. Ramirez responded, and Talos replied.  (Docket Entries Nos. 61, 68, 69).  Based on the motion, the response, the record evidence, and the applicable law, the court grants the motion and dismisses Ramirez's claims against Talos, with prejudice.  Final judgment is entered by separate order.  The reasons are explained below.

I.      Background

On May 18, 2019, Ramirez was working on the Talos Ewing Banks 305 oil and gas platform 25 miles off the Louisiana coast.  (Docket Entries Nos. 68-1, at 8; 68-2, at 4–5).  Earlier that day, Ramirez had a left-sided headache and took Tylenol.  (Docket Entries Nos. 68-1, at 44– 45; 68-9, at 18, 47).  Ramirez went to bed between 7:00 and 7:30 p.m.  (Docket Entries Nos. 61-4, at 11, 12; 61-5, at 25; 68-1, at 45; 68-9, at 18, 22).  He felt "okay" when he went to bed.  (Docket Entries Nos. 61-4, at 11; 68-9, at 18).

In the middle of the night, at around 12:45 a.m., Ramirez woke up to use the bathroom. (Docket Entry No. 68-1, at 11).  When he was in the bathroom, he noticed that he felt strange, that the left side of his face was numb, and that he was dizzy.  (Docket Entry No. 61-4, at 11; 68-1, at 10, 11; 68-9, at 18, 22).  Ramirez first called his girlfriend, who worried that he might be having a stroke.  (Docket Entry No. 68-6, at 13).  A few minutes later, Ramirez woke his roommate, Madrid Pitre, and described his symptoms.  (Docket Entry No. 68-1, at 10, 12–13).  Pitre ran a Google search of the symptoms and thought that Ramirez might have vertigo.  (Docket Entry No. 68-1, at 11).  The men went to Pitre's office, and Pitre went to wake up Joe Breland, the person in charge of the platform.  (Docket Entries Nos. 68-1, at 13–14; 68-2, at 16; 68-3 at 12).  Breland and Pitre returned to Pitre's office and sat with Ramirez on a bench outside Pitre's office so Ramirez could get some air.  (Docket Entry No. 68-1, at 15).

The nearest medic, Christopher M. Glancy, was on the drilling rig next to the platform. (Docket Entries Nos. 68-1, at 15; 68-2, at 10, 18).  Breland called Glancy, waking him up.  (Docket Entries Nos. 61-2, at 5; 68-2, at 18).  The precise time Breland called Glancy is unclear, but the evidence shows that Glancy reached Ramirez on the platform at around 3:00 a.m.  (Docket Entries Nos. 68-1, at 16, 17; 68-2, at 19).  Glancy examined Ramirez for about 20 to 25 minutes, running a few tests.  (Docket Entries Nos. 68-1, at 17–19; 68-2, at 26–27).  Unable to identify the cause of Ramirez's symptoms, Glancy called and woke up a doctor on land, Dr. Thibodaux, who instructed Glancy on what tests to run and what questions to ask.  (Docket Entries Nos. 61-2, at 20; 68-1, at 11, 19).  Glancy relayed the results of the tests to Dr. Thibodaux, who advised Glancy to get a helicopter "medevac," because he thought that Ramirez might be having a stroke.  (Docket Entries Nos. 61-2, at 20; 68-1, at 11).  Breland immediately called the medevac, at around 3:24 a.m.  (*Id.*; Docket Entries No. 61-3, at 1; 68-3, at 16, 30; 68-5, at 7–8).  It took between approximately 110

3

minutes to 155 minutes from when Ramirez woke up to when Breland called the helicopter to take Ramirez to the hospital.

Ramirez was transferred from the platform to the drilling rig, where the helicopter would land.  (Docket Entry No. 68-1, at 20).  Ramirez sat in a wheelchair near the helideck on the drilling rig for around 30 minutes before the helicopter arrived.  (*Id.*, at 23).  The helicopter arrived at 4:46 a.m., and left for the hospital at 4:59 a.m.  (Docket Entry No. 62, at 1).  The flight to the hospital took about 30 minutes.  (Docket Entries Nos. 68-1, at 44; 68-2, at 8).  At least two hours elapsed between when Breland called the helicopter to when Ramirez arrived at the hospital.  (Docket Entry No. 68-7, at 6).

During the flight, a paramedic, Charles L. Halcome, performed various tests on Ramirez to determine if he was having a stroke.  (Docket Entry No. 61-5, at 11).  These tests did not indicate a stroke.  As a result, Ramirez "did not meet the requirements for [Halcome] to give in-flight [] the critical care drugs that would start to break down a clot, which are time-sensitive."  (*Id.*, at 16, 26).

Ramirez arrived at the hospital at 5:38 a.m.  He was admitted one minute later, at 5:39 a.m.  (Docket Entry No. 68-9, at 11).  The hospital promptly initiated the protocol to determine if Ramirez was suffering from a stroke, including administering the NIH stroke test and a CT scan.  (*Id.*, at 20, 23, 27; Docket Entry No. 61-4, at 16).  Ramirez received a score of 1 on his NIH test, the lowest score, meaning that he had a "very low" risk "of severe stroke."  (Docket Entry No. 61-4, at 16).  The CT scan showed no acute intracranial hemorrhage.  (Docket Entry No. 68-9, at 59).

Ramirez was first seen by the attending physician, Dr. Andrew Philip Mayer, at around 6:00 a.m.  (Docket Entries Nos. 61-4, at 10; 68-9, at 20).  After meeting with Ramirez, Dr. Mayer believed that Ramirez might have Bell's Palsy, and not a stroke, based on his symptoms.  (Docket

Entries Nos. 61-4, at 13; 68-9, at 20).  Dr. Mayer spoke with a neurologist, Dr. Michael Puente, and ordered an MRI.  (Docket Entries Nos. 61-4, at 18; 68-9, at 38, 39).  The MRI began at around 8:11 a.m., and the report came back at around 8:44 a.m. (Docket Entry No. 68-9, at 40; Docket Entry No. 61-4, at 18 ("We ordered an MRI to try to expedite his evaluation, and he did have his MRI like two or three hours later, which is actually very fast.")).  Dr. Mayer did not administer the tPA treatment during this time.  (Docket Entry No. 61-4, at 18).

Based on the MRI, Ramirez was diagnosed with an ischemic stroke at the brain stem.  (*Id.*, at 29). Bell's Palsy was ruled out.  (*Id.*, at 21).  Ramirez was discharged from the hospital on May 21, 2019.  (Docket Entry No. 68-9, at 11).  He has permanent neurological problems from the stroke, including numbness on the left side of his face and dizziness, and he must use a cane or a walker.  (Docket Entry No. 68-1, at 33).

Ramirez sued Talos, alleging that its negligence in failing to evacuate him from the platform faster prevented Ramirez from receiving the tPA treatment that would have avoided or reduced his permanent neurological problems.   After discovery, Talos moved for summary judgment.

## II.    The Legal Standard for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex rel. Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, LLC*, 901 F.3d 605, 611 (5th Cir. 2018) (citations and internal quotation marks omitted).  The moving party

"always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 946 (5th Cir. 2019) (citation and internal quotation marks omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## III.   The Summary Judgment Record

In support of its motion, Talos submits the following summary judgment evidence:

- excerpts of Ramirez's deposition, (Docket Entry No. 61-1);

- excerpts of Glancy's deposition (the drilling-rig medic), (Docket Entry No. 61-2);

- Glancy's report, (Docket Entry No. 61-3);

- Dr. Mayer's deposition, (Docket Entry No. 61-4);

- excerpts of Halcome's deposition (the medevac paramedic), (Docket Entry No. 61-5);

- Halcome's report, (Docket Entry No. 62);

- excerpts of Ramirez's medical records from West Jefferson Medical Center, (Docket Entry No. 62-1);

- American College of Cardiology's Summary of the American Heart Association/American Stroke Association's *2018 Guidelines for the Early Management of Patients with Acute Ischemic Stroke: A Guideline for Healthcare Professionals from the American Heart Association/American Stroke Association*, (Docket Entry No. 62-3);

- excerpts of Breland's deposition (platform person in charge), (Docket Entry No. 62-4); and

- Talos Incident report prepared by Breland, (Docket Entry No. 62-5).

In response to Talos's summary judgment motion, Ramirez submits the following evidence:

- Ramirez's deposition, (Docket Entry No. 68-1);

- Breland's deposition, (Docket Entry No. 68-2);

- Pitre's deposition (Ramirez's roommate), (Docket Entry No. 68-3);

- Pitre's email to JT Eckstrum, a facilities engineer for the rig operators, (Docket Entry No. 68-4);

- Cameron Womack's deposition (operational HSE and SEMS manager for Talos), (Docket Entry No. 68-5);

- Mary Lynn Snyder's deposition (Ramirez's girlfriend), (Docket Entry No. 68-6);

- Dr. Bruce D. Charash's expert report, (Docket Entry No. 68-7);

- Ramirez's medical records from The Medicine Clinic of Morgan City, (Docket Entry No. 68-8);

- Ramirez's medical records from West Jefferson Medical Center, (Docket Entry No. 68-9); and

- Dr. Mayer's deposition, (Docket Entry No. 68-10).

IV.      **Analysis**

The Outer Continental Shelf Lands Act applies to Ramirez's negligence claim against Talos.  (Docket Entry No. 58, at 5 (citing 43 U.S.C. § 1331)).  Under that Act, federal law applies, but the law of the adjacent state is incorporated and applied to the extent it is consistent with the Act.  43 U.S.C. § 1333(a)(2)(A).  This court has previously determined that Louisiana law applies to Ramirez's negligence claim, because Louisiana is adjacent to the rig and that state's "negligence regime" is consistent with the Act.  (Docket Entries Nos. 47, at 7; 55, at 7; 58, at 5); *McCarroll v. Wood Grp. Mgmt. Servs.*, 561 F. App'x. 407, 409 (5th Cir. 2014); *Hufnagel v. Omega Serv. Indus.*, 182 F.3d 340, 349 (5th Cir. 1999) (applying Louisiana law to a negligence claim based on events that occurred on a platform off the Louisiana coast).

Under Louisiana law, Ramirez "must prove five separate elements" to prevail on his claim that Talos was negligent in failing to timely transport him off the platform and to the hospital. *Rando v. Anco Insulations Inc.*, 16 So.3d 1065, 1086 (La. 2009).  Those elements are that: (1) Talos owed Ramirez a duty; (2) Talos breached its duty to Ramirez; (3) Talos's "conduct was a cause-in-fact of [Ramirez's] injuries"; (4) Talos's conduct was "a legal cause of [Ramirez's] injuries"; and (5) actual damages.  *Id.*; *see also Davis v. Witt*, 851 So.2d 1119, 1127 (La. 2003).

Talos argues that Ramirez has not pointed to or submitted evidence creating a genuine factual dispute material to at least two elements of his negligence claim—the cause-in-fact element and the damages element.  (Docket Entry No. 61, at 16).  Ramirez argues that Talos's negligent delay in sending him to the hospital precluded him from getting the tPA treatment, which would have avoided the permanent effects of his stroke.  Talos argues that "the period to give tPA expired before [Ramirez] even woke up on the [platform]."  (*Id.*, at 17).  "[T]he treating physicians at WJMC . . . testified that they would never have administered a tPA to [Ramirez]" even if he

8

somehow could have reached the hospital the minute he woke up.  (*Id.*).  Talos's conduct had no bearing on whether Ramirez could receive tPA treatment.  In short, Talos neither caused nor contributed to the reason Ramirez did not get tPA.

For the same reason, Talos argues that Ramirez suffered no damages from Talos's conduct. "Even if, at the moment [Ramirez] woke up, he was instantly and telepathically transported from the [platform] to [the hospital], he still would not have received tPA because Dr. Mayer and the other professionals at [the hospital] had correctly concluded that the window to give tPA had expired." (*Id.*, at 18).  Ramirez's "treatment would have been the same no matter when [Ramirez] arrived at the hospital." (*Id.* (emphasis omitted)).

Ramirez responds that summary judgment should be denied because if Talos had transported Ramirez to the hospital faster, a different doctor would have been on duty, and that doctor "would have administered tPA medication had he been following the hospital's guidelines." (Docket Entry No. 68, at 1–2).  Ramirez argues that the evidence supports that his "last known well time" was approximately 12:45 a.m., when he woke up to use the bathroom, and that he was eligible for the tPA treatment until approximately 5:15 a.m. (*Id.*, at 2).  Ramirez argues that if he arrived at the hospital before then, he would have received the tPA treatment and avoided most of his permanent neurological damage. (*Id.*, at 2).

Ramirez and Talos agree on a few basic facts.  They agree that tPA is a treatment that can diminish, or in some cases eliminate, the lasting effects of an ischemic stroke.  They agree that tPA should be administered within three hours of the "last known well time," but that it can be administered up to four and a half hours after the onset of a stroke.  The parties dispute when Ramirez's "last known well time" occurred.

Ramirez argues that his "last known well time" was 12:45 a.m., because when he woke up to use the bathroom, he "was fine and had no symptoms," and only "after he started using the restroom" did he start experiencing the symptoms. (Docket Entry No. 68, at 2). If Ramirez's "last known well time" was 12:45 a.m., he could have received tPA treatment until approximately 5:15 a.m. Talos argues that Ramirez's "last known well time" was around 7:00 to 8:00 p.m., when Ramirez testified that he went to bed. (Docket Entry No. 61, at 7). That would make Ramirez eligible for tPA treatment until 12:30 a.m. at the latest. Talos asserts that Ramirez was ineligible for tPA before he even woke up on May 19, 2019.

Every medical professional who treated Ramirez on May 19, 2019, testified that Ramirez's "last known well time" was 7:00 or 7:30 p.m., when Ramirez went to bed, and acted on that basis. Even if Ramirez is correct that his "last known well time" was 12:45 a.m., and even if Ramirez had arrived at the hospital before 5:15 a.m., the treating doctors would not have administered tPA based on their belief—accurate or not—that his eligibility for tPA treatment had expired before Ramirez even woke at 12:45 a.m. on May 19, 2019.

Dr. Mayer, Ramirez's lead doctor, testified that he thought that Ramirez's "last known well time" was 7:00 or 7:30 p.m. on May 18, 2019, based on the information Ramirez provided at the hospital. (Docket Entry No. 61-4, at 6, 12). Dr. Mayer explained:

> Unfortunately, many times the situation is somebody wakes up in the morning and has symptoms and you don't know when it happened, except you know when they were last known well is when they went to bed. If they went [to] bed at 11:00 p.m., that would be—Even if they woke up at 8:00 a.m. with the symptoms, their last known well would be 11:00 p.m. when they went to bed, 'cause that's the last time they knew they were well.

(*Id.*, at 6). Dr. Mayer testified that even if Ramirez "had been brought to West Jefferson hospital at 2:00 a.m.," Dr. Mayer would not have treated Ramirez any differently "from what . . . was actually administered given his arrival at 5:30 a.m," because, based on what Ramirez told him,

10

Ramirez's "last known well time" was around 7:00 to 7:30 p.m. on May 18.  (*Id.*, at 21; *see also id.* at 33 ("Four and a half [hours] is our cutoff, and [Ramirez] was already excluded by waking up at 1:30.")).

The drilling-rig medic who first saw Ramirez, Christopher M. Glancy, testified that Ramirez did not know when his symptoms started.  (Docket Entry No. 61-2, at 28).  Glancy testified, "nobody knows if the symptoms started [when he woke to use the restroom] or maybe when he was sleeping, because I've mentioned he said he went to sleep, I believe at 1900 hours. . . .  And potentially the symptoms started with his headache the prior day."  (*Id.*).

The paramedic onboard the medevac helicopter, Charles L. Halcome, similarly testified that Ramirez's "last known well time" was 7:30 p.m.  In his deposition, Halcome was asked, "If Mr. Ramirez had gone to sleep at 7:30 p.m. that night—would—would that also be the basis for the last known well date if he went to sleep at 7:30 and didn't wake up till [sic] he told you he woke up?"  Halcome replied, "Correct, sir."  (Docket Entry No. 61-5, at 20).  Halcome explained that a patient's "last known well time" must "be witnessed" by someone other than that patient.  (*Id.*, at 17).  Halcome concluded that Ramirez's "last known well time" was 7:30 p.m. on May 18, 2019, (*id.*, at 19), and testified that Ramirez "did not meet the requirements" to receive in-flight "the critical care drugs that would start to break down a clot, which are time-sensitive."  (*Id.*, at 16; *see also* Docket Entry No. 62, at 2 ("Last Known Well Date/Time: 05/18/19 19:30:00")).

Every medical provider who treated Ramirez, from the medic to his attending physician at the hospital, believed that his "last known well time" was sometime around 7:00 to 7:30 p.m.  Glancy, the first provider to see Ramirez, testified that his "last known well time" may have been even earlier, starting with his headache on May 18, 2019.  Every person who treated Ramirez

11

believed that his window to receive tPA expired by around midnight on May 19, 2019, before Ramirez woke to use the bathroom, and treated Ramirez accordingly.

Ramirez asserts that his "last known well time" was 12:45 a.m.  Whether Ramirez woke up at 1:30 or 12:45 a.m., Ramirez *told* every person who treated him on May 19, 2019, that he woke up at 1:30 a.m.  Glancy, the on-rig medic, testified that Ramirez reported waking up to use the bathroom at 1:30.  (Docket Entry No. 61-2, at 9).  Halcome, the paramedic on the helicopter, testified that Ramirez told him that he woke up at 1:30 a.m.  (Docket Entry No. 61-5, at 22).  Halcome's written report reflects the same.  (Docket Entry No. 62, at 3 ("Patient stated on deck that symptoms were noted at 130 when he awoke to use the bathroom.")).  Dr. Mayer testified that Ramirez told him that he woke at 1:30 a.m. with symptoms.  (Docket Entry No. 61-4, at 6).  Dr. Mayer's notes in Ramirez's medical records reflect the same, noting that Ramirez "woke at approximately 01:30 with complaint of feeling like left side of his face was numb and weak." (Docket Entry No. 68-9, at 18).

If Ramirez's doctors had believed that his "last known well time" was when he woke to use the bathroom, as Ramirez argues, then his tPA treatment window would not have expired until 6:00 that morning.  Ramirez arrived at the hospital at 5:38 a.m., just within the eligibility window.  (*Id.*, at 11).  Ramirez was not administered tPA on the helicopter or at the hospital, however, because everyone who treated Ramirez believed that his "last known well time" was around 7:00 p.m. to 7:30 p.m., when Ramirez went to sleep, and not 1:30 a.m., when Ramirez woke up.  That put Ramirez over four and a half hours—outside the window to receive tPA.

The time lapse—which existed independent of Talos's actions—was not the only reason Ramirez did not get tPA when he first arrived at the hospital.  Dr. Mayer did not administer tPA to Ramirez because he initially did not think that Ramirez was having a stroke.  Dr. Mayer testified

that he thought that Ramirez had Bell's Palsy, (Docket Entry No. 61-4, at 13), and did not administer tPA because of this belief.  (*See* Docket Entry No. 68-9, at 20 ("The patient was seen at 05:55 upon my arrival.  A stroke activation had been initiated on his arrival. . . .  TPA was not indicated due to the suspicion that he has a Bell's palsy.")).  Dr. Mayer testified that if he administered tPA to someone who had Bell's Palsy, he would put that person "at risk for any of the side effects and complications of tPA therapy with no perceivable benefit."  (Docket Entry No. 61-4, at 14).

Because Dr. Mayer thought that Ramirez had Bell's Palsy, and not a stroke, he consulted with a neurologist, Dr. Puente, and scheduled an MRI.  (*Id.*, at 13).  Dr. Mayer spoke with Dr. Puente at 6:55 a.m.  (Docket Entry No. 68-9, at 20).  The MRI started at around 8:11 a.m., and the report came back around 8:44 a.m. (*Id.*, at 40; Docket Entry No. 61-4, at 18 ("We ordered an MRI to try to expedite his evaluation, and he did have his MRI like two or three hours later, which is actually very fast.")).  At least three hours elapsed from when Ramirez arrived at the hospital, at 5:38 a.m., until Dr. Mayer could rule out Bell's Palsy.  Talos had no involvement in the hospital's treatment.

Finally, the parties agree that no matter how quickly Talos acted to call the Medevac helicopter to the platform, it would take at least two hours to get Ramirez to the hospital.  (Docket Entry No. 68-7, at 6).  The fastest way to get from the platform to land is by helicopter, and that takes approximately 30 minutes each way, not including the time necessary to prepare for the flight.  (Docket Entries Nos. 68-1, at 44; 68-2, at 8).  From the platform to the hospital, plus the time it took Dr. Mayer to rule out Bell's Palsy, took a combined five hours.  The time for transportation and completion of the MRI put Ramirez outside the eligible window to receive tPA.

Despite undisputed facts showing that Talos's actions were not the cause-in-fact of Ramirez's inability to receive the tPA treatment, Ramirez argues that summary judgment should be denied because Talos's "motion is primarily based on the irrelevant argument that an emergency room doctor named Dr. Mayer testified that he would not have administered tPA medication. **But Dr. Mayer was not even on duty when Ramirez finally arrived at the hospital.**  He certainly was not on duty several hours earlier when Ramirez *should have* arrived at the hospital.  Simply stated, Dr. Mayer's testimony about what *he* would have done is irrelevant to answering the question of what *the doctor who would have been on duty during the relevant time period* would have done." (Docket Entry No. 68, at 1 (emphasis in original)).

Ramirez's argument that the testimony of Dr. Mayer is irrelevant because he was "not even on duty when Ramirez finally arrived to the hospital" is disingenuous and unpersuasive.  Ramirez arrived at the hospital at 5:38 a.m.  Dr. Mayer arrived at the hospital at 5:55 to begin his 6:00 a.m. shift.  In the 17 minutes between when Ramirez arrived at the hospital, to when Dr. Mayer first saw Ramirez, hospital staff were running tests to determine the cause of Ramirez's symptoms, including a CT scan of the brain to check for bleeding.  (Docket Entry No. 61-4, at 6).  These tests took about 10 to 15 minutes.  (*Id.*, at 15).  Ramirez saw Dr. Mayer as soon as the doctor "walked in the door." (*Id.*, at 10).  Dr. Mayer is not a random emergency room doctor whose testimony is speculative and irrelevant.  Dr. Mayer was the attending physician who treated Ramirez very soon after he arrived at the hospital.  Dr. Mayer's testimony about why he did not administer tPA medication to Ramirez, as Ramirez's treating physician, is certainly relevant.

Ramirez further asserts that Dr. Mayer's testimony is not relevant because, had Ramirez arrived at the hospital earlier, Dr. Mayer would not have been on duty.  Ramirez argues that a different on-duty doctor would have administered the tPA treatment.  The doctor on-duty at West

Jefferson Medical Center before Dr. Mayer was Dr. Mark Rice.  (Docket Entries Nos. 61-4, at 14; 68-9, at 52).   For Ramirez's argument to be persuasive, Dr. Rice would have had to find, contrary to Dr. Mayer, that Ramirez's "last known well time" was somewhere around 12:45 a.m. to 1:30 a.m., not 7:30 p.m.  Dr. Rice would also have to rule out Bell's Palsy without waiting for the MRI result.

There is no evidence in the record that Dr. Rice would have determined a different "last known well time" than Dr. Mayer, or that Dr. Rice would have immediately ruled out Bell's Palsy as a cause of Ramirez's symptoms rather than ordering an MRI.  Ramirez did not depose Dr. Rice during discovery.  Talos had scheduled a deposition of Dr. Rice, but cancelled it as "cumulative" and irrelevant because "Dr. Rice left at 6:00 a.m. and did not see the patient."  (*Id.*, at 35).  Ramirez's attorney agreed that Dr. Rice's testimony was unnecessary.  (*Id.*).  There is simply no evidence to support the argument Ramirez makes.

Ramirez retained an expert medical witness, Dr. Bruce D. Charash, to support his claim that he could have received tPA had he arrived at the hospital earlier.  Dr. Charash is an attending physician at Lenox Hill Hospital.  (Docket Entry No. 68-7).  In his report, Dr. Charash wrote that, "given the nature of Mr. Ramirez's stroke, if tPA had been administered shortly after 05:00, [Ramirez] would have had a major reduction in his permanent damage."  (*Id.*, at 7).  Notably, Dr. Charash's report does not identify Ramirez's "last known well time," but it is evident that Dr. Charash determined that Ramirez's "last known well time" was around 12:30 a.m., based on his statements that tPA could have been administered until 5:00 a.m., and that "[t]here is no benefit of giving tPA after more than 4 ½ hours after a stroke."  (*Id.*, at 8).  That is contrary to the conclusions of all the medical providers who treated Ramirez that his "last known well time" was between 7:00 to 7:30 p.m. the night before.

Even if Dr. Charash is correct that Ramirez could have benefitted from tPA had it been administered before 5:00 a.m., Dr. Charash's report does not provide evidence that the hospital, and specifically Dr. Rice, would have done so had Ramirez arrived before 5:00 a.m.   The hospital staff did not know that Ramirez was suffering from an ischemic stroke when he arrived at the hospital.  It took hours for Dr. Mayer to reach that conclusion.

Dr. Charash did not review Dr. Mayer's deposition testimony before preparing his report. (*Id.*, at 4).  As a result, Dr. Charash's report does not mention or address Dr. Mayer's determination that he "needed further evaluation" before he could conclude that Ramirez was having a stroke. (Docket Entry No. 61-4, at 13).  Dr. Charash did not mention Dr. Mayer's determination that Ramirez needed an MRI, or that it was only after the MRI that Ramirez's medical team discovered "a very unusual stroke" in Ramirez's brain stem.  (*Id.*).  Dr. Charash did not address that it took Dr. Mayer and the hospital team until 8:44 a.m. to receive the final results of Ramirez's MRI— which showed the brain stem stroke—slightly over three hours after Ramirez arrived at the hospital.  (Docket Entry No. 68-9, at 40).  Dr. Charash did not state that he, or any other doctor, would have acted differently than Dr. Mayer in choosing not to administer tPA until Bell's Palsy was ruled out as a cause of Ramirez's symptoms.

Dr. Charash states that if a helicopter had "been called at 01:25, [Ramirez] would have arrived at West Jefferson Hospital by 03:26.  Had the call for the helicopter been made at 02:25, he would have arrived at West Jefferson Hospital at 04:26."  Dr. Charash asserts that Ramirez could have received tPA at either arrival time.  But even if Ramirez had arrived at the hospital at 3:26 a.m., it took Dr. Mayer approximately three hours to rule out Bell's Palsy.  Ramirez would still be outside the eligible window to receive tPA.  There is no evidence in the record that this testing was unnecessary or that Dr. Rice—or Dr. Charash—would had acted differently.  Nor is

16

there evidence that this testing could have been completed faster had Ramirez arrived at the hospital earlier.  In fact, Dr. Mayer testified that Ramirez received his MRI results faster than normal.  (Docket Entry No. 61-4, at 18).

No matter what time Ramirez arrived at the hospital on the morning of May 19, 2019, no evidence in the record supports Ramirez's argument that he would have received the tPA treatment at the hospital.  There is no evidence to support Ramirez's claim that Talos is responsible for his inability to receive tPA treatment.

## V.      Conclusion

Talos's motion for summary judgment, (Docket Entry No. 61), is granted.  Ramirez's claims against Talos are dismissed, with prejudice.  Final judgment is entered by separate order.

SIGNED on November 12, 2021, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge

17